2006 WY 152

**James Thomas MOULTON,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. 05–244.**

Supreme Court of Wyoming.

Dec. 15, 2006.

Representing Appellant: Ken Koski, State Public Defender, PDP; Donna D. Domonkos, Appellate Counsel; Diane Courselle, Faculty Director, DAP; Michael Irvin, Student Intern; Kathryn Hogarty, Student Intern. Argument by Ms. Hogarty.

Representing Appellee: Patrick J. Crank, Attorney General; Paul Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; James Michael Causey, Assistant Attorney General. Argument by Mr. Causey.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] James Moulton was charged with one count of manufacturing psilocyn,[1] a felony, in violation of Wyo. Stat. Ann. § 35-7-1031(a)(ii) (LexisNexis 2005). Prior to trial, he filed a motion to suppress evidence seized from his residence pursuant to a search warrant obtained by deputies after they entered and searched the residence without a warrant. The district court concluded the emergency assistance exception to the warrant requirement applied, upheld the search and denied the motion. Mr. Moulton changed his initial plea of not guilty to guilty, reserving his right pursuant to W.R.Cr.P. 11(a)(ii) to

---

1. Psilocyn is not defined in the Wyoming Statutes. Psilocyn, like psilocybin, is a chemical obtained from certain mushrooms found in Central America and Mexico; it is a Schedule 1 hallucinogenic substance classified chemically as a tryptamine. http://www.dea.gov/concern/psilocybin.html

appeal the district court's order denying his suppression motion. We affirm the denial.

## ISSUES

[¶ 2] Mr. Moulton presents the following issue for our review:

Did the trial court err in declaring that the search of Mr. Moulton's residence was proper under the emergency assistance exception to the warrant requirement of Article 1, § 4 of the Wyoming Constitution and of the Fourth Amendment to the United States Constitution?

The State rephrases the issue as follows:

Did the district court err in denying appellant's motion to suppress?

## FACTS

[¶ 3] On August 20, 2004, at 4:30 a.m., Deputy Bill Motley of the Platte County Sheriff's Office received a telephone call at his home in Wheatland, Wyoming from a dispatcher indicating she had received a garbled radio transmission which concerned her. Deputy Motley went to the dispatch office to listen to the recording of the transmission. He heard a female voice saying the words "Med Tech 3" but could not understand the rest of the transmission. The dispatcher informed Deputy Motley she had determined through some telephone calls that "Med Tech 3" was Crystal Moulton, an emergency medical technician (EMT) who lived in Glendo with her husband and children. The dispatcher also indicated she had obtained telephone numbers for Ms. Moulton, tried those numbers and received no answer.

[¶ 4] The fact that an EMT had attempted to contact dispatch by radio transmission at 4:30 in the morning concerned the dispatcher and Deputy Motley. Therefore, Deputy Motley decided to drive to Glendo and see if he could locate Ms. Moulton. Accompanied by Deputy Samantha Klier, Deputy Motley traveled to Glendo and arrived at the Moulton residence between 5:00 and 5:30 a.m. Deputy Motley knocked on the door of the mobile home but there was no response. He tried the door, found it unlocked, and opened it. From outside the door, he announced that he was with the sheriff's de-

partment. There was no response and he and Deputy Klier entered the mobile home.

[¶ 5] Inside, in what appeared to be the living room, the deputies saw no one. Using their flashlights because the residence was dark, they proceeded to a closed door to the right of the living room. Deputy Motley knocked and announced that he was with the sheriff's department. No one answered and Deputy Motley opened the door. Inside, he saw two teenage girls who appeared to be asleep. He awakened them and identified himself. The girls identified themselves as James and Crystal Moulton's daughters. At the suppression hearing, Deputy Motley testified he asked one of them if she knew where her mother was and she responded, "[I]f she wasn't home, she was down by the lake with her dad." The daughter testified the deputy asked if her parents were home and she said, "No, sir, they're not." She testified the deputy then asked if she knew where they were and she responded, "[Y]es, they would be at the river."

[¶ 6] The deputies left the girls in the bedroom and continued through the home, opening doors as they came to them. The last room they came to appeared to be the master bedroom. The deputies stepped into the room and Deputy Motley observed a clear plastic piece of PVC tubing approximately two to three feet long sitting on the lid of a bucket outside the closet. The closet was open and Deputy Motley looked inside. He saw a vaporizer on the top shelf and a box with a covered jar containing an unknown substance on the floor of the closet. Next to the box he observed a fluorescent light. On a dresser outside the closet, Deputy Motley observed a glass jar covered on top with tin foil poked with tiny holes. Inside the jar was a tan and gray substance resembling a vermiculite and brown rice mixture, commonly used for growing mushrooms. He noticed another jar of the same appearance elsewhere in the room.

[¶ 7] Having determined Ms. Moulton was not present in the home, the deputies left the house to search for her around Glendo Lake where the daughter said she might be. After searching for several hours, they were unable to locate her. Deputy Motley

suggested they check the residence again and, if Ms. Moulton had not returned, inform the sheriff and search and rescue. Upon returning to the residence, the deputies found Ms. Moulton. She told them her vehicle had gotten stuck down by the lake and she had called dispatch for help.

[¶ 8] Having determined Ms. Moulton was safe and not in need of assistance, the deputies left the residence and returned to Wheatland. Later that afternoon, Deputy Motley spoke to the sheriff and the county attorney about what he had seen inside the Moulton residence. He submitted an application for a search warrant to the magistrate based upon his observations. The magistrate issued a search warrant and deputies searched the residence and found evidence related to the possession and manufacture of a controlled substance.

[¶ 9] Initially, the State filed three charges against Mr. Moulton: possession of a controlled substance, marijuana, a felony, in violation of § 35–7–1031(c)(iii); possession of a controlled substance, methamphetamine, a misdemeanor, in violation of § 35–7–1031(c)(i)(C); and endangering children, controlled substances, a felony, in violation of Wyo. Stat. Ann. § 6–4–405(b) (LexisNexis 2003). In a separate proceeding, the State filed a fourth charge against Mr. Moulton: manufacture of a controlled substance, psilocyn, a felony, in violation of § 35–7–1031(a)(ii). The prosecution moved to join the proceedings in one action, which motion was granted. Mr. Moulton pled not guilty to all of the charges and the district court set the case for trial.

[¶ 10] Mr. Moulton filed a motion to suppress the evidence seized during the search of his residence. At the hearing on the motion, the district court listened to the taped radio transmission and heard testimony from Deputy Motley, Deputy Klier and one of the Moultons' daughters. Based upon the evidence presented, the district court made the following findings of fact relevant to the issue presented for our review:

— There was a call to the Platte County Sheriff's Office by Ms. Moulton in her capacity as a medic;

— The district court listened to the tape and there did appear to be some urgency in the voice of the caller;

— The Sheriff's Office was concerned Ms. Moulton was either in trouble herself or had found someone in trouble;

— The deputies proceeded to Glendo and arrived at the Moulton residence at approximately 5:30 a.m. They walked around the outside of the residence. Deputy Motley knocked loudly on the door and received no response. He tried the door, found it was unlocked, opened the door and announced his presence. The deputies went into the trailer and saw no one in the living room or kitchen;

— They then went to a bedroom door, knocked and announced their presence. The door was opened and two teen-age girls were discovered asleep in their beds. Deputy Motley woke up one of the girls and asked her if she knew where her mother was. She responded that if she wasn't at home, she was down at the lake "or river" with their dad;

— The deputies went to the bedroom at the far end of the hallway. In the room they saw in plain sight evidence of some type of drug operation, including a vaporizer, a cooler, PVC pipe and some jars with material in them. Both deputies very quickly concluded it looked like some type of system for growing mushrooms; and

— All of the drug growing equipment was in plain sight in the bedroom and there was no intentional search of the residence for drug paraphernalia.

[¶ 11] The district court reached the following conclusions of law:

— Based on the call, the Platte County Sheriff's Office had a reasonable basis to believe that Ms. Moulton was either in trouble herself or had encountered trouble;

— It was reasonable for the Platte County Sheriff's Office to use their best efforts to find Ms. Moulton;

— It should have been an expectation of Ms. Moulton's that once she identified herself as a medic to the Platte County Sheriff's Office at 4:30 in the morning the Sheriff's Office would try to find her;

— The Sheriff's Department had a reasonable basis to believe there was some type of emergency that needed to be responded to;

— The Deputies then reasonably went to the Moulton residence for the purpose of finding Ms. Moulton;

— Given the likely emergency, it was reasonable to enter the Moulton residence to determine if Ms. Moulton was present;

— It was during this attempt to aid Ms. Moulton that the drug paraphernalia was discovered;

— There was no search of closed containers but rather simply a search for the person of Ms. Moulton. The drug paraphernalia was in plain sight in the bedroom; and

— The search of the Moulton residence for Ms. Moulton was not illegal or improper, but rather fell appropriately with the emergency assistance exception to obtaining a search warrant.

The district court entered an order denying the motion to suppress.

[¶ 12] After the district court's ruling, Mr. Moulton changed his plea to guilty on the charge of manufacturing psilocyn conditioned upon his right to appeal the order denying his suppression motion. In exchange for his guilty plea to the one count, the State dismissed the other three charges filed against Mr. Moulton. The district court sentenced Mr. Moulton to forty-eight to seventy-two months imprisonment and suspended execution of the sentence pending completion of twelve months incarceration in the Platte County Jail and three years supervised probation. Mr. Moulton appealed the district court's order denying his motion to suppress.

## STANDARD OF REVIEW

[¶ 13] The question of whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law and is reviewed *de novo*. *O'Boyle v. State*, 2005 WY 83, ¶ 18, 117 P.3d 401, 407 (Wyo.2005). We reverse a district court's factual findings on a motion to suppress only when they are clearly erroneous. *Id.*

## DISCUSSION

[¶ 14] Mr. Moulton claims the district court erred in ruling the search of his residence was proper under the emergency assistance exception to the warrant requirement of Article 1, § 4 of the Wyoming Constitution and the Fourth Amendment to the United States Constitution. Citing *People v. Allison*, 86 P.3d 421 (Colo.2004), Mr. Moulton asserts for a search to be reasonable under the emergency assistance exception law enforcement officials must have a reasonable basis approximating probable cause that associates the emergency with the area searched. He argues the garbled radio transmission did not provide deputies a reasonable basis associating an emergency with the Moulton residence. He claims the radio transmission may have given them a reasonable basis for going to the residence but it did not provide a reasonable basis for searching the residence. He characterizes the radio transmission as giving rise to a theoretical possibility that an emergency existed at the residence, not the required reasonable basis associating an emergency with the residence.

[¶ 15] Citing *Pena v. State*, 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo.2004), the State asserts the emergency assistance exception applies when law enforcement officials have a reasonable basis for believing a person's life, safety or property is in danger. In such cases, the State argues, officers may enter and search an area to render assistance but not to look for evidence. Because the deputies in this case entered the residence to look for Ms. Moulton and provide assistance in response to her radio transmission and because their search of the residence was limited to looking for her, the State contends the

search was proper under the emergency assistance exception.

[¶ 16] The substantive law governing searches is well established. Unreasonable searches and seizures are prohibited by the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution. Searches and seizures conducted without a warrant are per se unreasonable under both constitutions unless they are justified by probable cause and established exceptions. *Pena,* ¶ 29, 98 P.3d at 870. Consent is one exception to the warrant requirement. *Id.* Other exceptions include a search: 1) of an arrested suspect and the area within his control; 2) conducted while in pursuit of a fleeing suspect; 3) to prevent the imminent destruction of evidence; 4) of an automobile upon probable cause; 5) which results when an object is inadvertently in the plain view of police officers while they are where they have a right to be; and 6) which results from an entry into a dwelling in order to prevent loss of life or property (also referred to as the emergency assistance exception). *Id.* The question of whether an exception applies to support a search without a warrant is dependent upon all of the facts and circumstances viewed in their entirety. *Id.* When a defendant properly objects to or moves for suppression of evidence seized, the State bears the burden of proving that one of the exceptions applies. *Id.*

[¶ 17] This Court has considered the applicability of the emergency assistance exception to the warrant requirement in two prior cases. In *Pena,* law enforcement received a 911 report that two people had been shot in a mobile home. Deputy Doyle initially entered the mobile home to determine who was inside and whether anyone needed medical attention. He found two dead bodies and no one else inside, left the mobile home and called for an investigator. The investigator arrived and entered the home to inspect the scene. He observed rifle caliber shell casings on the floor and two dead bodies. Law enforcement later obtained a search warrant.

[¶ 18] Addressing the defendant's claim that the searches were unconstitutional, we held the searches were justified without a warrant by exigent circumstances and were constitutional. Specifically, we concluded the searches fell within two of the recognized exceptions to the warrant requirement: a search resulting from entry into a dwelling to prevent loss of life and a search to prevent the imminent destruction of evidence. We said:

> The emergency assistance exception applies when police have a reasonable basis for believing that another's life or safety is in danger. In that case, they may search the area to render assistance, but not to search for evidence. To prevent loss of life or property, an officer may walk through a home to determine if anyone else is present when officers have a reasonable belief that the area harbors an individual posing a danger to those present. Further, in previous decisions, we have upheld warrantless searches to prevent the imminent destruction of evidence.

> . . . [T]he evidence supports finding that the warrantless entries by the law enforcement officers onto the crime scene were justified under these exceptions. Deputy Doyle testified that he did not know that anyone inside was deceased and entered to see if anyone needed medical attention. The deputy had a reasonable basis for believing emergency aid was required, and his initial entry was justified. Immediately after determining that no one inside the home was alive and the suspect was not inside, Deputy Doyle left the home because he was concerned that the killer might return to it and waited outside for other law enforcement to arrive.

> Deputy Doyle's search was limited to the emergency assistance exception. He only checked on the health and safety of persons in the home. Pena, however, was still at large and reportedly armed. Officer safety concerns, as well as evidence preservation, support the second entry by the more highly trained investigator. Investigator Thompson arrived and spent three to four minutes inside the home assessing the crime scene. He observed the presence and location of the two bodies and rifle shell casings. [The 911 report indicated] use of a shotgun. Because the shell casings were from a rifle, Deputy Doyle im-

mediately advised other officers who were still looking for Pena that Pena was armed with a rifle, a longer-range weapon.

*Pena,* ¶¶ 31–33, 98 P.3d at 871.

[¶ 19] In *Ortega v. State,* 669 P.2d 935 (Wyo.1983), law enforcement officials arrested the defendant outside his home after he called and reported shooting his wife. Upon arresting the defendant, one of the officers went inside the home to check on the condition of the victim. We held the officer's entry into the home was proper under the emergency assistance exception. *Id.* at 941. We further held once inside the home the police officer was authorized to take cognizance of items within plain view. He was entitled, we said, to see what came into his field of vision while he was where he had a right to be. So long as the initial intrusion was justified, "the police while within the legitimate scope of their entry may search the premises with their eyes." *Id.*

[¶ 20] In *Pena* and *Ortega,* officers entered private residences without a warrant in response to reported shootings. Like these Wyoming cases, the majority of cases in which other courts have applied the emergency assistance exception to uphold a warrantless search have involved reports of violence where the victims were thought to be seriously injured. The general rule is that application of the emergency assistance exception is strictly limited to situations involving specific, clearly described emergencies occurring inside the residence from which officers perceived an immediate need to respond in order to protect life or limb. *See State v. Ryon,* 137 N.M. 174, 108 P.3d 1032 (N.M.2005)(containing an instructive discussion of the exception). In cases involving generalized, non-specific information that someone might be inside the residence and might be injured, courts typically have not applied the emergency assistance exception to uphold a warrantless search. *Id.*

[¶ 21] Mr. Moulton's case does not involve a specific, clearly described report of an emergency occurring inside the Moulton residence from which the deputies perceived an immediate need to respond in order to protect life or limb. Rather, it involved a garbled radio transmission received at 4:30 a.m. from an EMT from which the sheriff's office could discern very little. Neither the parties' briefs nor our research has produced any cases involving facts similar to those presented in this case in which courts have considered the emergency assistance exception. Having carefully considered in their entirety the facts and circumstances presented, we hold the search was constitutional based upon the emergency assistance exception to the warrant requirement.

[¶ 22] The radio transmission received by dispatch was from an EMT. Deputy Klier testified the dispatcher who received the transmission was very upset because she was afraid someone was in danger but could not determine who or what kind of danger. Deputy Klier testified: "[Danger] is inherent in our line of work. We don't get called on the 911 or on a radio transmission, unless something is wrong." Deputy Klier further testified when Deputy Motley picked her up to drive to Glendo he said, "We have a broken radio transmission. We think somebody is in trouble." Deputy Motley testified he was concerned Ms. Moulton had come upon an accident or was involved in an accident and needed help. The district court listened to the tape and found there was some urgency in the caller's voice.

[¶ 23] Given these circumstances—the urgent 4:30 a.m. radio transmission from an EMT using a portable radio—the sheriff's office had no real choice but to respond. Ignoring the call was not a reasonable option. Law enforcement had a reasonable basis to believe that an emergency existed to which an immediate response was required. Efforts to reach Ms. Moulton by telephone were unsuccessful. The only other information the sheriff's office had to make contact with her was her home address. Under these circumstances, it was reasonable for the deputies to attempt to locate her and to proceed to her residence in an effort to do so.

[¶ 24] Upon arriving at the residence and receiving no response to their efforts to make their presence known, it was reasonable given the urgent sounding early morning radio transmission from an EMT for the deputies to enter the home to look for Ms. Moulton.

Even after talking with the daughter, it was reasonable for the deputies to look for Ms. Moulton in other areas of the house, including the master bedroom. Once inside the bedroom, the deputies were authorized to see what was in plain view. All of the evidence indicated the drug growing paraphernalia was in plain view. No evidence was presented to suggest the deputies had intentions, other than to locate Ms. Moulton, when they looked inside the home. After discovering the items in the master bedroom, Deputy Motley said to Deputy Klier, "[W]e are not here for this. We have got a possible emergency. We are here to find Ms. Mouton and make sure she is all right." Once they determined Ms. Moulton was not there, the deputies left the residence. They were inside the house for about seven minutes. Under these circumstances, the district court correctly concluded the search of the Moulton residence for Ms. Moulton was not illegal or improper, but rather fell appropriately with the emergency assistance exception to obtaining a search warrant.

[¶ 25] Mr. Moulton cites *Allison* as supporting his argument that the radio transmission was not enough to avoid the warrant requirement. In *Allison*, police were dispatched to a residence after a 911 hang-up call. A woman answered the door, revealed that a domestic dispute had occurred, and eventually let an officer inside. The officer removed the individuals involved in the altercation from the residence and then reentered the residence without a search warrant. The trial court found, and no party disputed, that the initial entry was either consensual or justified by an emergency. *Allison*, 86 P.3d at 423. The question was whether the re-entry was valid without a search warrant based upon the emergency assistance exception.

[¶ 26] The Colorado Supreme Court held the emergency aid exception did not support the officer's re-entry into the home after arresting and removing the offenders. The Court concluded no emergency existed at the time the officer re-entered the home because the domestic incident was over, the individuals involved had been removed from the premises and there was no indication anyone else was involved in the incident. Therefore, the officer had no reasonable basis to believe an emergency continued to exist requiring his assistance. Additionally the Court found the evidence demonstrated the officer entered the residence the second time to conduct a criminal investigation, rather than to render emergency assistance. The Court affirmed the trial court's order suppressing the evidence. We cited *Allison* in *Pena* for the principle that when police have a reasonable basis for believing another's life or safety is in danger, they may search the area to render assistance but not for evidence.

[¶ 27] Mr. Moulton's case is distinguishable from *Allison* in important ways. In *Allison*, the officer re-entered the home without a warrant after the emergency was over with no reasonable basis for believing at that point anyone was in danger. Here, the deputies entered the home knowing only that the resident of the home, an emergency medical technician, placed an urgent sounding call to dispatch at 4:30 that morning, circumstances we have concluded created a reasonable basis for believing Ms. Moulton was in need of emergency assistance. Unlike in *Allison*, the emergency justifying the initial entry into the Moulton residence remained unresolved. It was not clear until the deputies inspected the home that it was secure. At that point, the party whom the deputies reasonably believed needed emergency assistance had not been found. Thus, the emergency giving rise to the initial entry still existed and the deputies were justified in looking through the home.

[¶ 28] Additionally, there was no evidence presented in Mr. Moulton's case that the deputies entered the home for any purpose other than to locate Ms. Moulton. In fact, the evidence was that even after observing the drug growing paraphernalia, the deputies continued their search for Ms. Moulton outside the residence for two more hours. Unlike the situation in *Allison*, the totality of the circumstances at the time the decision was made to look for Ms. Moulton inside the residence demonstrated that the deputies had a reasonable basis to believe an emergency existed requiring their assistance.

[¶ 29] Mr. Moulton emphasizes his daughter's testimony that she told Deputy Motley her parents were not home and were down by the lake. He argues that once the deputies were told Ms. Moulton was not in the residence, their reason for being there was no longer viable and they were not authorized to continue looking through the home. Our response to this contention is twofold.

[¶ 30] First, the district court heard the testimony of both Deputy Motley and Mr. Moulton's daughter. After weighing their testimony, the district court entered a finding of fact in accordance with Deputy Motley's testimony. Although our review of the constitutionality of the search is *de novo*, we review the district's court factual findings pursuant to the clearly erroneous standard. We do not find the district court's factual finding on the disputed testimony clearly erroneous.

[¶ 31] Second, regardless of whose testimony was believed, the deputies had a reasonable basis even after talking with the daughter to continue looking for Ms. Moulton inside the residence. Based on Ms. Moulton's urgent, early morning radio trans-mission identifying herself as an EMT, the deputies reasonably believed she needed assistance. Whether or not they were told by the just awakened teenage daughter that her mother was not there, it was reasonable under the circumstances for them to finish looking inside the residence before continuing their search elsewhere.

## CONCLUSION

[¶ 32] Considering the totality of the circumstances in this case, we conclude the officers were acting reasonably when they investigated the possible emergency and properly limited their efforts to determining whether anyone was in need of assistance rather than investigating a crime. The emergency assistance exception applies in these circumstances and the deputies' entry into and search of the Moulton residence was constitutional. Affirmed.